CATHERINE E. TRASK *vs.* OLD COLONY RAILROAD COMPANY & another.

Suffolk.   January 22, 1892. — May 9, 1892.

Present: FIELD, C. J., ALLEN, KNOWLTON, MORTON, & LATHROP, JJ.

*Employers' Liability Act — Connecting Railroads.*

It may not be necessary, in order to render an employer liable for an injury occurring to an employee through a defect in the ways, works, or machinery within the meaning of the St. of 1887, c. 270, that they should belong to him ; but it should at least appear that he has the control of them, and that they are used in his business by his authority, express or implied.

The occasional use by each of two railroad companies of the track of the other
in delivering and taking cars in the course of business will not, to that extent,
make the track of each company part of the ways, works, or machinery of the
other, within the meaning of the St. of 1887, c. 270; and it would be unreason-
able to hold that each company was bound to leave and take cars at the precise
point of connection, at the peril, if it did not do so, of becoming liable for
injuries resulting from any defect in the track of the other.

TORT, against the Old Colony Railroad Company and the
Union Freight Railroad Company, under the St. of 1887, c. 270,
by the plaintiff, as widow of one Isaac Trask, to recover for his
death, caused on the tracks of the Boston and Maine Railroad,
in Boston, on May 18, 1890. Trial in the Superior Court, be-
fore *Barker*, J., who, at the close of the evidence, directed a
verdict for both of the defendants, and ordered a judgment
to be entered for the Old Colony Railroad Company, without
prejudice to the right of the plaintiff to prosecute his action
against the Union Freight Railroad Company, as though it
had been the sole defendant.

It appeared in evidence that the tracks of the Union Freight
Railroad Company were laid upon Causeway Street, and from
Causeway Street through Haverhill Street to the end thereof,
where the tracks of the Boston and Maine Railroad began.
The tracks of the Union Freight Railroad Company were con-
structed with longitudinal sleepers, connected by cross ties,
upon which were laid the ordinary flat street railway rail. The
track of the Boston and Maine Railroad Company was the
ordinary steam-railroad T rail track, laid upon cross sleepers,
and the two tracks, which were level, physically connected, so
that engines and cars could and did pass from the one to the
other.

The Boston and Maine Railroad track was a spur or branch
track, extending from its main tracks to the track of the Union
Freight Railroad, and was used to transfer freight from its main
tracks to the track of the Union Freight Railroad Company.

The track of the latter company was maintained and kept
in repair by that company, and the track of the Boston and
Maine Railroad was maintained and kept in repair by that
company. The Union Freight Railroad Company had nothing
to do with maintaining or repairing the track of the Boston
and Maine.

The plaintiff's counsel claimed to recover only on account of an alleged defective joint in the Boston and Maine Railroad track, by which he claimed that the death of Trask was caused.

It appeared that cars to be delivered or transferred from the Boston and Maine Railroad to the Union Freight Railroad were usually placed upon the above described Boston and Maine track, or the connecting Union Freight track, there being no exact position for them to be placed upon either track. They were sometimes left wholly upon the Boston and Maine, sometimes wholly upon the Union Freight track, and sometimes partly upon each.

The Union Freight Railroad Company's engine, with its men, would come down upon its track, and connect with and draw out the cars thus left. Generally it could fasten upon the cars without going upon the Boston and Maine tracks, but sometimes it was obliged to go down upon these for that purpose.

After the engine was fastened to the cars, the brakeman or flagman of the Union Freight men working with the engine would go over the cars to free or loosen the brakes, and after the connection had been made between the cars and the engine, the engine and cars were wholly managed by the Union Freight employees; and in loosening brakes and bringing out the cars they would have often to be upon cars then on the Boston and Maine portion of the track, and in motion.

A few feet beyond the end of the Union Freight track, and at the right hand side of the Boston and Maine track, was a small freight-house, known as the " little house."

On the morning of May 18, 1890, between one and two o'clock, a train of twelve ice cars was standing by the " little house," so called, some of the cars upon the Union Freight track towards Causeway Street, and some upon the Boston and Maine track alongside of the " little house," and some upon the Boston and Maine track beyond the " little house," toward the main line.

In the right hand rail of the Boston and Maine Railroad track, coming from Causeway Street toward the main line of the Boston and Maine Railroad, and about six feet beyond the farther corner of the " little house," there was a defective joint. At this joint there was no fishplate to connect

the rails, and the end of the farther rail nearer the main line was about two inches higher than the end of the rail toward Causeway Street, and there was a space of about two inches between the ends of the rails.

There was evidence that the end of the farther rail rested in the chair, of which the spikes were loose and stuck up half their length, and the end of the nearer rail toward Causeway Street did not rest in the chair, but was on the ground. The joint was described as old, bad, rusty, and dirty, and the spikes and the chair as rusty, and the whole chair as " loose to kick," and there was evidence as to what was required in a good joint.

The dummy of the Union Freight Railroad Company, with a gang of men, consisting of an engineer, fireman, two brakemen, and two flagmen, in charge of a conductor by the name of Grace, backed down on the Union Freight Railroad Company's track on Haverhill Street, between one and two o'clock on the morning of May 18, 1890, and coupled on to the train of ice cars above described, for the purpose of drawing them out upon the Causeway Street track. Isaac Trask, who was one of these brakemen, got upon the train at the forward end, on the Union Freight track, and went backward along the train, throwing off the brakes preparatory to starting; he was seen going along the top of the train toward its rear end, and when he had let off all the brakes on all the cars, and was on the Boston and Maine track, he gave a signal to the fireman of the dummy from the rear end for the train to go ahead. No one else was on the top of the cars, but the other trainmen were at their proper stations.

One Callahan, a brakeman, testified that he was standing on the ground, by the side of the train, just beyond the " little house "; that soon after Trask gave the signal to go ahead, he gave an order to Trask to signal to stop the train; that at this time Trask was standing on the train, on the side of the train opposite the " little house," about the middle of the third car from the rear end of the train; that immediately after giving the signal, Trask went forward on the cars toward the dummy to the forward end of the third car, and the witness heard a noise between the front end of the third car and the back end of

the fourth car from the rear of the train, that sounded like the noise of setting brakes; and that the noise appeared to be at a point about fifteen feet back of the farther corner of the " little house," toward the Boston and Maine line, and nearly up to the bad joint, as the train moved toward Causeway Street, but the witness could not see Trask.

Callahan further testified, that, immediately after the accident, he examined the brakes between the third and fourth cars where he had heard the noise, and found the brake on the front end of the third car from the rear of the train fully set, and that on the back end of the fourth car partly set. These brakes were arranged with sill steps, so called. The dog and ratchet were on a sill step about ten inches wide, and about eighteen inches below the top of the car; and such brakes could not be set by a man standing on the top of a car, but must be set by one standing on the sill step, in order to work the dog into the ratchet with his foot, as the wheel of the brake was turned ; and that after the accident he went back with the fireman, one Burdain, and found Trask's lantern and hat lying near together between the rails of the Boston and Maine track, within a few feet of the joint above described, and almost opposite to it, and about a foot nearer the draw than the joint.

Burdain testified that he was in the cab of the engine ; that he saw Trask get upon the head of the train with a red lantern, and go back over the tops of the cars, throwing off brakes; that when Trask had reached the rear end of the train, Trask gave him the motion to go ahead, and the dummy then started slowly forward towards Causeway Street, at a speed of about one or two miles an hour. After proceeding a short distance, Trask gave him a motion to stop, and almost immediately afterwards he saw Trask's lantern whirl round and disappear; that at the time he had no idea that an accident had occurred, and the motion of Trask's lantern gave him no intimation that anything unusual had happened; that he first knew of the occurrence of the accident when the dummy had pulled up beyond the switch, and the conductor called out to him to stop, and told him that there was something under the train, which afterwards turned out to be Trask's body.

There was evidence that the ice cars were from fourteen to

fifteen feet long, with two wheels at each end, the axles being about three feet from the ends, and that in passing over a bad joint the cars would give a quick, strong sway and jar, and would be affected more than an ordinary freight car of twenty-eight or thirty feet in length; that the space between the cars was from two and a half to three feet.

The first blood spot was found on the track about six feet from the joint before described, in the direction in which the cars were moving, and nearly under the farther corner of the roof of the " little house "; that the body was found at the switch on Haverhill· Street, on its back, the head toward the left side of the track, as the train was going; that the body was almost cut in two; and that there were spots of blood, etc. between the first place and the place where the body was· found.

There was evidence that Trask was in perfectly good health, and sober, at the time of the accident; that he had worked as flagman or brakeman, off and on, for about two months, during which time he had repeatedly come in upon this track of the Union Freight Railroad Company, for the purpose of taking cars from the Boston and Maine Railroad, and that all the work was night work.

The judge reported the case to this court for its determination. If the ruling at the close of the evidence was correct, judgment was to be entered on the verdict for the Union Freight Railroad Company; if incorrect, the verdict was to be set aside, and a new trial ordered.

*F. Ranney*, for the plaintiff.

*J. H. Benton, Jr.*, for the Union Freight Railroad Company.

MORTON, J.   Without considering the question of due care on the part of the plaintiff's intestate, we think it cannot be held that the defect in the track of the Boston and Maine Railroad was a defect in the ways, works, and machinery of the defendant.   It may not be necessary, in order to render an employer liable for an injury occurring to an employee through a defect in the ways, works, or machinery, that they should belong to him, but it should at least appear that he has the control of them, and that they are used in his business, by his authority, express or implied.   Roberts & Wallace, Em-

ployers' Liability, (3d ed.) 249, 250. Neither the employer nor any person in his service can be justly charged with negligence as to matters over which they have no control. The phrase, " connected with or used in the business of the employer," (St. 1887, c. 270, § 1, cl. 1,) cannot be taken literally, but when used in connection with ways, works, and machinery must be understood to mean ways, works, and machinery connected with or used in the business of the employer by his authority, and subject to his control. It is expressly stated in the report, that the track of the defendant company was maintained and kept in repair by it, and that the track of the Boston and Maine was kept in repair by that company, and that the defendant had nothing to do with maintaining and repairing the track of the Boston and Maine.

It therefore appears that the defendant had no authority or control over the tracks of the Boston and Maine. Sometimes, from the position of the cars, the defendant was obliged to go upon the track of the Boston and Maine to get them, though generally it could fasten to them without going on that track. The occasional use by each company of the track of the other, in delivering and taking cars in the course of business, would not, to that extent, make the track of each a part of the ways, works, or machinery of the other. It was permitted for their mutual accommodation, and was merely a license which did not give either any rights in or control over, and which did not impose upon either any obligation respecting the track of the other. The character of the business transacted is to be considered, and it would be unreasonable to hold that each company was bound to leave and take cars at the precise point of connection, at peril, if it did not do so, of making the track of the other part of its ways, works, and machinery, and of becoming liable for injuries resulting from any defect in it.

> *Judgment on the verdict for the Union Freight Railroad Company.*